IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS,

        Plaintiff,

v.                                                              No. 10-CV-0002-WPJ/SMV

KEN SALAZAR, Secretary of the
United States Department of the Interior,

        Defendant.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR REVERSAL OF AGENCY ACTION

THIS MATTER comes before the Court upon the Plaintiff's Motion for Reversal of Agency Action (Doc. 29) filed on July, 8, 2011. On December 21, 2004, Defendant United States Fish and Wildlife Services ("FWS") issued a final decision not to list the Sacramento Mountains Checkerspot Butterfly ("the Butterfly") for protection under the Endangered Species Act ("ESA"). On June 28, 2007, Plaintiff WildEarth Guardians ("Plaintiff") filed for an emergency listing of the Butterfly as an endangered species. On September 2, 2009, FWS again decided not to list the Butterfly as an endangered or threatened species.

In response, Plaintiff filed this Motion for Reversal of Agency Action (Doc. 29)[1] against Respondent Ken Salazar, the Secretary of the United States Department of the Interior in his official capacity,[2] alleging that FWS's decision to deny its petition violates Section 4 of the ESA

---

[1] Plaintiff initially filed a complaint (Doc. 10) for declaratory and injunctive relief on January 4, 2010. However, Defendant correctly pointed out that challenges to federal agency actions are not subject to the use of normal civil trial procedures because reviews of agency actions in district court must be processed as appeals. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). Accordingly, Plaintiff properly filed this Motion for Reversal of Agency Action.

[2] As Secretary of the U.S. Department of the Interior at the time Plaintiff's motion was filed, Mr. Salazar had authority over the FWS, which decided not to list the butterfly under the ESA.

and is arbitrary, capricious and contrary to law within the meaning of the Administrative Procedure Act ("APA").

Upon reviewing the applicable law and arguments presented by both parties, Plaintiff's Motion is DENIED.

## BACKGROUND[3]

### I.     The Sacramento Mountains Checkerspot Butterfly

The Butterfly inhabits parts of New Mexico's Sacramento Mountains within Otero County and within and around the boundaries of the Village of Cloudcroft. The Butterfly has a total habitat of approximately 2,700 acres, which is about equally divided between private lands and United States Forest Services ("USFS") lands in the Sacramento Ranger District of the Lincoln National Forest ("the Forest"). The Butterfly is known to lay eggs only on New Mexico penstemon, a flowering perennial plant, and its larvae are known to feed only on New Mexico penstemon and valerian. Preventing the fragmentation of the Butterfly's meta-population structure[4] is essential to its survival.

### II.     Procedural Chronology Leading Up to This Motion[5]

*First Filing*: On January 28, 1999, FWS received a petition from the Southwest Center for Biological Diversity to list the Butterfly as an endangered species under the ESA. On December 27, 1999, FWS made a positive 90-day finding that listing might be warranted. FWS conducted a status review of the species, and on September 6, 2001, issued its 12-month finding, proposing to list the Butterfly as endangered.

---

[3] The facts here are supported by the parties' exhibits and are undisputed unless otherwise noted.
[4] Meta-population is a set of local populations within an area, where typically migration from one local population to other areas containing suitable habitat is possible, but not routine.
[5] On July 15, 2014, Defendant filed a notice declaring that the "Federal Defendant no longer contests Plaintiff's standing." Doc. 50. The Court agreed and found that Plaintiff has standing to file this lawsuit and to pursue its claims asserted in this case. Doc. 51.

In 2004, USFS, Otero County, and the Village of Cloudcroft responded by executing a Memorandum of Understanding ("MOU") where they agreed to implement the Conservation Plan ("the Plan") issued in 2005, to help conserve the Butterfly "through voluntary participation of public and private partners." On December 21, 2004, FWS issued a final decision not to list the Butterfly as endangered or threatened.

*Second Filing*: On June 28, 2007, Plaintiff filed a petition for emergency listing of the Butterfly as an endangered species. FWS issued a positive 90-day finding on December 5, 2008, indicating that listing the Butterfly might be warranted. After a status review of the species, FWS issued on September 2, 2009 its final decision not to list the Butterfly under the ESA.

Plaintiff filed this Motion for Reversal of Agency Action (Doc. 29).

## LEGAL STANDARD

### I.     The Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).[6] ESA §4 directs the Secretary of the Interior, acting through the FWS, to determine whether a particular species should be listed as "endangered" or "threatened." 16 U.S.C. § 1533.[7] ESA § 4(a)(1) sets forth five factors that must be considered in the listing determinations:

(A) the present or threatened destruction, modification, or curtailment of the species' habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;

---

[6] The ESA defines an "endangered" species as "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), whereas a "threatened" species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

[7] The Secretary of the Interior is generally responsible for terrestrial and freshwater species, which would include the Butterfly.

  (D) the inadequacy of existing regulatory mechanisms; and
  (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c).

The FWS must make this listing determination "solely on the basis of the best scientific and commercial data available," without reference to the possible economic or other impacts of such a determination. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b). "The obvious purpose of [this requirement] is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 117 S.Ct. 1154, 1168 (1997). "Reliance upon the best available scientific data, as opposed to requiring absolute scientific certainty, 'is in keeping with congressional intent' that an agency 'take preventive measures' *before* a species is 'conclusively' headed for extinction." *Ctr. for Biological Diversity v. Lohn*, 296 F.Supp.2d 1223, 1236 (W.D.Wash.2003) (emphasis in original).

 II. **The Administrative Procedure Act**

Judicial review of administrative decisions involving the ESA is governed by the judicial review provisions of the APA. 5 U.S.C. § 706; *Wyoming Farm Bureau Fed'n v. Babbitt*, 1999 F.3d 1224, 1231 (10th Cir. 2000) (review of ESA claims are governed by APA). Under the APA, an agency's decisions are upheld unless they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *See* 5 U.S.C. § 706(2)(A-D); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Relevant portions of *Olenhouse* elaborate that "the essential function of judicial review is a determination of…whether the action is otherwise arbitrary, capricious or an abuse of discretion." 42 F.3d at 1574.

 A. <u>The "Arbitrary or Capricious" Standard</u>

To determine whether agency action was arbitrary or capricious, the court must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id*. In evaluating the agency's explanation, the court must survey whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.

For example, an agency decision must be set aside if "the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Olenhouse*, 42 F.3d at 1575 (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). This means that the agency must clearly disclose in the record its grounds for making the decision. *American Petroleum Institute v. E.P.A.*, 540 F.2d 1023, 1029 (10th Cir. 1976).

"The agency must make plain its course of inquiry, its analysis, and its reasoning." *Id.* "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles. If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action

was the product of reasoned decisionmaking, the reviewing court may supplement the record or remand the case to the agency for further proceedings." *Olenhouse*, 42 F.3d at 1575.

Furthermore, even if the agency violates the APA, its error does not require reversal unless a plaintiff demonstrates prejudice resulting from the error. *See* APA § 706 ("[D]ue account shall be taken of the rule of prejudicial error"); *see also WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) ("even if an agency violates the APA, this does not require reversal unless the appellant demonstrates prejudice resulting from the error"). Importantly, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 708 (10th Cir. 2009).

## DISCUSSION

### I. FWS Properly Relied on the Five Conservation Measures to Analyze the Adequacy of "Existing Regulatory Mechanisms" Under Factor D.[8]

One of the five factors that ESA requires FWS to consider when making its listing determination is the "inadequacy of existing regulatory mechanisms." ESA § 4(a)(1). In its 2009 final decision, FWS analyzed five measures[9] from the Plan. The Plan as a whole is voluntary and not enforceable, and the general rule is that FWS may not consider voluntary conservation measures to analyze existing regulatory mechanisms. *Oregon Natural Resources Council v. Daley*, 4 F.Supp.2d 1139, 1153-55 (D.Ore. 1998) (finding that voluntary conservation efforts "by definition, are not…'regulatory'" and "the Secretary may not rely…on unenforceable efforts").

---

[8] Factor D refers to "inadequacy of existing regulatory mechanisms" of ESA's listing determination elements. 16 U.S.C. §1533 (a)(1)(D).

[9] The five measures are as follows: (1) domestic and trespass livestock; (2) public recreation such as camping and off highway vehicle usage; (3) collection of species; (4) best management practices; and (5) protecting and managing Butterfly habitat. AR 006726-41, AR 006991.

There seems to be two exceptions to this general rule. First, courts have permitted the FWS to rely on voluntary measures that have been reliably and successfully implemented. *See Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 2007 WL 716108 at *3 (D. Colo. 2007) (rejecting the plaintiff's argument that "voluntary efforts must be rejected when they are not enforceable through a regulatory mechanism" and upholding FWS's reliance "on a history of conservation efforts"); *see also id.* ("Cooperation with a demonstrated commitment to preservation of the species with the interaction of government and non-government agencies is inherently more effective than governmental edicts or mandates"). After all, nothing in the ESA requires that a regulatory mechanism must be binding and enforceable before FWS may consider it. *See* 16 U.S.C. § 1533 (a)(1)(D). Hence, Plaintiff's claim that FWS illegally relied on the voluntary Plan to analyze factor D is misplaced because FWS clearly stated in its 2009 decision that it "did not rely on other conservation efforts identified in the Conservation Plan," but instead, only relied "on these [five] measures because the USFS has demonstrated that these conservation efforts are being implemented and that they are effective." AR 1374.

Second, FWS has carved out an exception to the general rule prohibiting the consideration of non-regulatory measures in listing decisions by adopting the PECE Policy (Policy for Evaluation of Conservation Efforts when Making Listing Decisions) in 2003. 68 Fed.Reg. 15,100 (March 28, 2003). The purpose of this policy is to "provide[] direction to Service personnel in determining how to consider a conservation agreement when making a decision on whether a species warrants listing under the Act." *Id.* PECE requires the FWS to consider "the certainty that the conservation efforts will be implemented and the certainty that the efforts will be effective," providing a list of criteria relevant to the required analysis. *Id.*

Although Plaintiff contends that FWS illegally relied on the five voluntary measures without first having applied the PECE Policy, FWS clarifies that PECE applies only to conservation efforts that "have not yet been implemented" or "have not yet demonstrated whether they are effective at the time of a listing decision." 68 Fed. Reg. 15100, 15113 (Mar. 28, 2003). In other words, if a voluntary measure has already been implemented and shown to be effective, then FWS need not undergo the PECE analysis. Here, FWS clearly stated in its final decision that USFS has "demonstrated that these [five measures] are being implemented and…effective." AR 1374. The Court shall give deference to an agency's interpretation of its own regulations. *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 794 (10th Cir. 2010) (stating that a court must give the agency's interpretation of its own regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation"). As follows, FWS correctly refrained from conducting the PECE analysis, and its reliance on the five measures does not render its findings arbitrary and capricious.

As a final note on this matter, a prerequisite to determining that existing regulatory mechanisms are inadequate is a finding that in the absence of such mechanisms, there would be significant threats to the species in question. *See Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 402 F.Supp. 2d 1198, 1209 (D.Ore.2005), *reversed in part on other grounds*, 274 Fed. Appx. 542 (9th Cir. 2008) (holding that FWS is not required to find under Factor D that the existing regulatory mechanisms would "fully protect or remove all risks" to a species). Because FWS ultimately determined in its 2009 decision that there were no current or future threats to the Butterfly warranting a listing in the absence of the Plan, FWS explains that it only relied on the five measures to further conserve the Butterflies by mitigating risks, rather than to prevent a threat that would place the Butterflies in danger of extinction. *See* AR 1368-81.

**II. FWS's Reliance on USFS's Designation of the Butterfly as a "Sensitive Species" in Determining Whether There Are "Adequate Regulatory Mechanisms" to Protect the Butterfly Was Not Arbitrary and Capricious (Factor D).**

In determining that there are adequate regulatory mechanisms, FWS partly relied on USFS's designation of the Butterfly as a "sensitive species." Once USFS designates a species as "sensitive," it must meet certain procedural obligations as well as provide the species with substantive protections. *See* 16 U.S.C. § 1604(g)(3)(B). Such obligations include preparing a Biological Evaluation ("BE") and a National Environmental Policy Act ("NEPA") analysis for every ground-disturbing action occurring on USFS lands that will affect that sensitive species or its habitat. Plaintiff contends that because USFS did not prepare a BE for every action that impacts the Butterfly and NEPA exists purely to inform rather than to regulate, such procedural mechanisms are not adequate regulatory mechanisms, rendering FWS's reliance on USFS's designation of the Butterfly as a sensitive species arbitrary and capricious.

Yet, Plaintiff only focuses on discussing USFS's procedural duties without discussing the substantive protections that USFS also provides its sensitive species. AR 1374 ("Sensitive species receive special management emphasis to ensure their viability and to preclude trends toward endangerment that would result in the need for Federal listing"); *see* 16 U.S.C. § 1604(g)(3)(B) (stating that USFS must "provide for diversity of plant and animal communities); *Ecology Center v. U.S. Forest Serv.*, 451 F.3d 1183, 1186 (10th Cir. 2006) (noting that the "duty to ensure viable populations 'applies with special force to sensitive species'"). Here, such substantive protections afforded by the USFS include various regulations such as limiting grazing and ground-disturbing activities to certain months. The Court finds nothing arbitrary and capricious about FWS's finding that these regulatory mechanisms designed to protect the Butterfly are adequate.

Further, FWS comments that even though USFS did not prepare a BE for the two telephone company related projects that Plaintiff mentions in its motion, USFS still provided FWS with information on the extent of the projects' impacts. *See* AR 19 & 120. As for the two other projects which Plaintiff claims were not preceded by BEs, FWS points out that Plaintiff provides no evidence of this assertion other than an email that estimates the amount of habitat temporarily impacted. Ultimately, FWS asserts that it was aware of these small projects, regardless of whether or not BEs were prepared, and considered them in its 2009 listing decision where FWS concluded that such low-level, temporary impacts do not threaten the Butterfly. AR 1371. The Court agrees with FWS that USFS's imperfect implementation of its "sensitive species" obligations does not make FWS's reliance arbitrary and capricious. *Center for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271, 1293 (D.N.M. 2005); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (holding that "[d]efficiencies in an [environmental impact statement] that are mere 'flyspecks' do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal").

### III. FWS Did Not Rely on Promises of Future Regulatory Action in Assessing the Threats Associated With OHV Usage and Dispersed Camping (Factor B).[10]

In 2004, USFS produced a map and report (the 2004 Meadows Disturbance Report) that categorized meadow disturbances caused by dispersed camping[11] and Off Highway Vehicles (OHV) use in the Forest. AR 6770. The report found that dispersed camping and OHV use was increasing in the Forest, and that impacts were occurring in about half of the occupied Butterfly habitat. *Id.* Because USFS took specific actions to effectively reduce such impacts, FWS held in

---

[10] Factor B is "overutilization for commercial, recreational, scientific, or educational purposes" of ESA's listing determination elements. 16 U.S.C. §1533 (a)(1)(B).
[11] Dispersed camping is camping outside a designated campground.

its 2004 listing decision that neither OHV use nor dispersed camping posed a significant threat to the Butterfly. AR 4251.

In its 2009 listing decision, FWS noted the information from USFS's 2007 "Monitoring and Evaluation Report," which states that OHV use is a growing activity in the Lincoln National Forest. AR 7358, 7365. FWS also considered information from USFS's 2008 "Travel Analysis Report for the Lincoln National Forest" which reported that user-created roads had expanded beyond the 300 feet distance allowed under the Forest Plan. AR 7311. More specifically, this report indicated that out of 477 dispersed campsites, approximately 100 campsites were found beyond the legally permitted boundary. *Id.* Despite these reports, FWS concluded in its 2009 decision that OHV use and dispersed camping are not significant threats to the Butterfly now or in the near future. AR 1370.

Plaintiff contends that in arriving at this conclusion, FWS illegally relied on USFS's promise to revise its Travel Management Plan ("TMP") by the end of year 2009. *Biodiversity Legal Foundation v. Babbitt*, 943 F.Supp. 23, 52 (D.D.C. 1996) (finding that FWS "cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record"). If revised, the TMP would have reduced OHV use and dispersed camping from within 300 feet of existing roads to 100 feet, generate the production of new maps to reflect this change, and authorize the Forest to prohibit motor vehicle use off the designated system. AR 1369. After FWS released its 2009 decision, USFS decided not to modify its TMP.

Rather than relying on the proposed 2009 TMP, FWS states that it relied on the analysis contained in its 2004 listing decision which concluded that neither OHV use nor dispersed camping was a significant threat to the butterfly. AR 1369-70. FWS stated in the 2009 decision that "[according to its 2004 listing decision], actions …USFS had taken to reduce OHV impacts

11

[were] effective… OHV use d[id] not significantly threaten the Butterfly…[and] this continues to reflect the best available information." AR 1369.

In other words, despite the 2007 report stating that OHV use is growing in the Forest, FWS still found that that growth did not amount to a significant threat to the Butterfly's survival because the measures implemented by USFS to reduce incursions into Butterfly habitat were still effective. *See Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 881 (9th Cir. 2009) (rejecting argument based on finding that "OHV use is on the rise throughout the lizard's remaining range" because the available studies do not show that "OHV use amounts to a significant threat to the species' viability"). Since FWS found that OHV use still does not pose a significant threat to the Butterfly, FWS could not have based its conclusion on the implementation of the promised 2009 TMP. As follows, FWS's discussion of the TMP and how it will "*further* reduce the impact of motorized vehicles on the Butterfly and its habitat" does not render its conclusion unreasonable. AR 1370 (italics added for emphasis).

Similarly, FWS stated in the 2009 decision that there is "no information to indicate that camping has increased since 2004 in habitats occupied by the [B]utterfly." *Id.* While Plaintiff points to the findings in the 2008 report recording 477 dispersed camping sites on the entire Sacramento Ranger District, FWS could not use this report to conclude that dispersed camping threatens the Butterfly because the report "did not [specify] how many [campsites] were within meadows occupied by the [B]utterfly…" AR 1370. Therefore, FWS was "not aware of any information that supports the contention that camping-related impacts to the [B]utterfly or its habitat have increased or are likely to do so in the foreseeable future." *Id*. Again, FWS could not have relied on the 2009 TMP to remedy a threat with no evidentiary support.

 **IV.** **FWS's Assessment of the Threat Posed by Private Land Development is Not Arbitrary and Capricious (Factor B).**

The Plan indicates that approximately 50 percent of all meadows that might support the Butterfly are in private ownership where recommendations of habitat management for the Butterfly can be suggested but not regulated. AR 4277. In its 2001 proposal to list the Butterfly, FWS examined how private land development may cause fragmentation of the Butterfly's meta-population. There, FWS concluded that "commercial and private development is a significant threat to the … [B]utterfly." AR 3517.

Plaintiff challenges FWS's assessment of the threat private land development poses to the Butterfly (Factor B). According to Plaintiff, FWS failed to discuss in its 2009 listing decision the crucial fragmentation issue. For instance, Plaintiff asserts that FWS only considered the impacts of private land development on occupied suitable habitat when the non-occupied suitable habitat is equally important to maintain the Butterfly's meta-population structure. AR 4116. *See New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 706 (10th Cir. 2009) (stating that "the location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them").

As FWS explains in the 2009 decision, there was no new information regarding the effects of private development on the Butterfly since the 2004 decision. Therefore, FWS expressly relied on its findings on private development from the 2004 decision to conclude that "the threat of commercial and private development is not believed to be significant at this time." AR 4254. Because the 2004 decision discussed fragmentation and unoccupied suitable habitat, FWS technically did address those issues in the 2009 decision. AR 4245.

Next, Plaintiff claims that FWS stated in its 2004 Memorandum for Interested Individuals ("2004 MII") (AR 4116) that the Ordinance[12] is a condition to its decision not to list the Butterfly such that without the Ordinance, "the species likely meets the definition of threatened and endangered." AR 4116. While knowing that the Ordinance will expire on July 1, 2011, Plaintiff contends that FWS illegally relied on the number of permit applications submitted while the Ordinance was in effect to predict future development in the Village of Cloudcroft. AR 1369 ("the Village of Cloudcroft has received no permit applications for new subdivisions since the ordinance became effective in 2005").

As an initial matter, the 2004 MII states that it recommends the Ordinance should be implemented to "minimize or avoid current threats to the [B]utterfly…" and that if the Ordinance is not implemented, the threats of commercial and private development "will remain imminent and significant, indicating that the species likely meets the definition of threatened or endangered." *Id.* That the species will *likely* need listing without the Ordinance is not equivalent to stating that implementation of the Ordinance is a condition to not listing the Butterfly, as Plaintiff worded it.

Further, Plaintiff's contention regarding FWS's speculation on future development is simply incorrect. While the Ordinance was implemented in 2005, the information FWS relied on to predict future development was based on a draft economic analysis conducted from the years 2000 to 2004 when the Ordinance was not yet in effect. AR 1369 ("In our 2004 draft economic analysis, we found that approximately 8 to 10 new homes had been constructed annually since

---

[12] The Ordinance refers to the Otero County Subdivision Ordinance, which mandates that "for any new subdivision to be developed within potential [B]utterfly habitat, a survey be conducted for the [B]utterfly, its habitat, and its larval host plant." AR 1368. If survey shows the presence of Butterfly or its habitat, "the developer must submit plans to address wildfire control, avoidance of destruction of [B]utterfly and its habitat, and if avoidance is not possible, relocation of [B]utterflies and restoration of destroyed habitat." AR 1368.

2000…Based on this trend of 8 to 10 new homes annually, over the next 20 years, approximately 160 to 200 new residential projects may be built within the boundary of the then-proposed critical habitat for the [B]utterfly"). Since FWS's projection on future development was based on information gathered before the Ordinance was in effect, it is irrelevant that that Ordinance will expire in 2011.

Finally, Plaintiff mentions that FWS illegally speculated that water availability, as opposed to the Ordinance, is what constrained growth in Otero County. AR 1369. However, FWS's water shortage theory is merely a side note that played no part in its estimation on future development. FWS is free to speculate as long as its final decision is not based on such speculations. Hence, FWS's determination that the threat posed by private development is not significant was not arbitrary and capricious.

### V. FWS Properly Assessed the Threat to the Butterfly From Future Insecticide Spraying in Private Lands (Factor E).[13]

The 2009 listing decision recognizes that there are "currently no mandatory requirements to minimize impacts to the [B]utterfly if spraying was to occur on private lands." AR 1376. However, in order for insecticide spraying to threaten the Butterfly's survival, FWS announced that the spraying must "result[] in large continuous blocks of occupied habitat being affected during the active period of the [B]utterfly." AR 1376.

Relevant to this discussion are two incidents of insecticide spraying on private lands that took place in 2007. The first involved small scale ground spraying in June 2007 where private landowners targeted the fir looper moth located in the mixed conifer forest which adjoins the

---

[13] Factor E refers to "other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1)(E).

open meadow habitat of the Butterfly. There, the landowners shared costs to ground spray at a period when the Butterfly larvae had not yet entered diapause.[14]

FWS explained in its 2009 decision that even assuming "a worst-case scenario [] that drift from the spray affected all [10 acres] of potentially suitable [B]utterfly habitat" around the treated area, "impacts would be less than 0.4 percent of the suitable [B]utterfly habitat … (10 out of 2,709 acres)." AR 1376. Less than 0.4 percent does not even come close to "large continuous blocks of occupied habitat." *Id.* Moreover, FWS explains that future "ground applications are not likely to affect a significant proportion of occupied [B]utterfly habitat" because it is "unlikely that such ground applications would be implemented on a large enough scale to be effective in controlling a severe outbreak of a forest insect pest." *Id.* Hence, the Court finds that FWS reasonably concluded that such small scale treatment by private landowners "would not be considered a significant impact affecting the future viability of the species." AR 1376.

Next, there was a second spraying incident in 2007. Otero County supported the large scale aerial application of insecticide to control the fir looper infestation at a time the Butterfly larvae had not yet entered diapause. Pursuant to the framework of the Plan,[15] Otero and USFS requested technical assistance from FWS on the appropriate measures to minimize impacts to the Butterfly. AR 1375. FWS essentially advised that the application of insecticide be delayed until the Butterfly larvae enter diapause because harm to the Butterfly could be "significant if [insecticide] was applied when larvae of the [B]utterfly were actively feeding." AR 1376. Also, USFS conducted a NEPA analysis to determine the effects to private and Federal lands of insecticide spraying on Federal lands. Ultimately, Otero County and the Village of Cloudcroft postponed spraying until USFS surveys showed that the larvae of the Butterfly were in diapause.

---

[14] Diapause refers to a phase in which the larvae are "inactive and not feeding." AR 1376.
[15] FWS had agreed in the Plan to provide technical assistance on management of the Butterfly when requested. AR 1377.

In concluding that "effects to the [B]butterfly will be minimized" if "any future insect control efforts are proposed," FWS provided two main reasons. AR 1376. First, FWS states in its listing decision that it found "no other reports of documented spraying" in its review of the recent insect-pest outbreaks and spraying to control forest insect pests. AR 1377. Given that the last documented insect sprayings occurred in 1952 and 1984, which were at least twenty-something years ago, the Court agrees with the FWS that such infrequent occurrences are too speculative to use as a basis for a determination that insecticide spraying is a significant threat to the Butterfly now or in the near future. AR 4976-78. Second, FWS assures that "it is unlikely that large contiguous blocks of [B]utterfly habitat would be sprayed…on private lands without combining such efforts with the USFS" because the cost of such efforts "may be prohibitive for private landowners unless they work with USFS." AR 1376.

Plaintiff contends that FWS's statement regarding large-scale spraying being cost-prohibitive is arbitrary and capricious. In making this claim, Plaintiff erroneously relies on the acreage of open meadow Butterfly habitat (1,319 acres) to base its calculation for the expense of spraying when in actuality, defoliating insects dwell in the mixed conifer forest, 13,000 acres of which lie adjacent to the Butterfly habitat. As follows, the correct calculation for the cost of spraying just the 13,000 acres would be approximately ten times Plaintiff's projected estimation. The Court recognizes that there still lingers the question of whether the accurately estimated cost of spraying would be high enough to compel Otero County and the Village of Cloudcroft to coordinate with USFS. FWS possesses the necessary expertise in ascertaining the scope of the word "cost-prohibitive," and the Court shall defer to the agency in determining this matter.

Next, Plaintiff argues that FWS assumes in its decision that the Plan will "somehow induce Otero County and private landowners to conduct any future aerial spraying activities in a

17

way that minimizes impacts to the [B]utterfly and only after consultation with the FWS." Doc. 29, at 58. Nowhere in the 2009 listing decision does FWS suggest this.[16] Rather, the decision "note[s] that the Conservation Plan provided the framework under which USFS and Otero County requested and received technical assistance" and that "[t]hrough this framework and subsequent dialog, the USFS carefully chose the timing of [insecticide] application to specifically avoid larvae of the [B]utterfly." AR 1376. Simply stated, FWS merely discussed in its decision the role the Plan played in providing a mechanism for Otero and USFS to coordinate with FWS when they needed technical assistance.

Lastly, Plaintiff asserts that Otero and private landowners' collaboration with the USFS will not necessarily protect the Butterfly because conducting a NEPA analysis would provide the USFS decision-maker with more information on the environmental impacts of the spraying but would not require USFS to take any particular action to minimize harm to the Butterfly. Further, even if the NEPA analysis leads USFS to decide not to spray or to defer spraying on USFS lands until the butterflies enter diapause, Plaintiff asserts that there is no assurance that Otero County or private landowners would honor that decision regarding the private lands.

Essentially, Plaintiff asks FWS to list the Butterfly based on the *possibility* that some time in the future, there may be a massive insect outbreak that warrants large scale aerial spraying where Otero County and private individuals refuse to collaborate with the USFS and instead, conduct the spraying at a time the Butterfly larvae are not in diapause. There is no information that such an incident has ever occurred before. On the contrary, the 2007 aerial

---

[16] In AR 1375, FWS states under its discussion of "Private Lands" that "the [B]utterfly currently receives adequate regulatory protection through the USFS sensitive species designation and the commitments provided in the Conservation Plan." This is a general statement which in no way suggests that the Plan induces Otero County and private individuals to act based on what is in the best interest of the Butterfly. Instead, FWS focuses its discussion on the USFS, which "instituted proactive protective measures by analyzing potential impacts through the NEPA process and by fulfilling the commitments in the conservation plan." *Id.*

spraying, which constitutes the best available information, "demonstrates a willingness by the Village of Cloudcroft and Otero County" to request assistance from USFS. AR 1377. Therefore, the Court finds reasonable FWS's conclusion that insecticide spraying does not pose a significant threat to the Butterfly now or in the foreseeable future.

>   VI.   **FWS's Analysis of the Threat Posed by Climate Change is Not Arbitrary and Capricious (Factor E).**

Parties dispute the significance of information found in a section in the Plan regarding climate change and the Butterfly. *See* AR 4295 ("For endemic species with low dispersal capabilities and small geographic ranges, like the Sacramento Mountains … [B]utterfly, the probability of extinction within the next 50 years ranges from 22%...to 52%"). Plaintiff asserts that the Plan's findings and projections constitute the "best available information" which FWS failed to consider in making its 2009 decision. Instead, FWS stated that it has "little information to accurately predict or assess how the [B]utterfly or its food plants will respond to a changing climate," which Plaintiff claims is inconsistent with FWS determination that the "effects related to climate change will not result in significant impacts to the [B]utterfly." AR 1377, 1379.

FWS on the other hand, contends that the prediction in the Plan is a statement referring generally to species with low dispersal capabilities and small geographic ranges "like the Sacramento Mountains … [B]utterfly" that is not based on any information specific to the Butterfly. For example, information on potential temperature and precipitation in the Sacramento Mountains, the Butterfly's relationship with its host plants, how those plants might respond to temperature and precipitation changes, or how the Butterfly might respond to changes in host plant availability are the types of information that FWS would have needed to conduct a proper assessment of the effects of climate change on the Butterfly. In contrast, the document that the

Plan relies on warned that there are "many unknowns…in projecting extinctions" and that the "values provided here should not be taken as precise predictions." Exhibit C at 147.

The Court finds FWS's decision not to rely on the Plan's generic report reasonable. Without specific information that indicates climate change significantly threatens the Butterfly, FWS cannot reasonably conclude so. Plaintiff argues that it is arbitrary and capricious to premise the listing decision on "uncertainty," and the Court partly agrees: a listing decision based on uncertainty which holds that a species *is* significantly threatened would be arbitrary and capricious. Stated another way, FWS cannot conclude that climate change *is* a threat to the Butterfly based on the fact that there is not enough information that climate change is not a threat. However, it is reasonable for FWS to determine that climate change does not pose a significant threat to the Butterfly granted that there is not enough information demonstrating the existence of such a threat. In this respect, FWS acted neither inconsistently nor in an arbitrary or capricious manner.

## CONCLUSION

The Court finds and concludes that FWS did not conduct its analysis in its 2009 listing decision in an arbitrary or capricious manner. Accordingly, the Court DENIES the Plaintiff's Motion for Reversal of Agency Action.

**SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE